181195, Flixer International, Inc. v. Scrutinizer GMBH. May it please the Court, Ned Sackman here on behalf of the appellant, Scrutinizer GMBH, may I reserve one minute for rebuttal time? You may. Thank you. This is a case of first impression under Federal Rule 4K2. Affirming the district court's decision here would result in universal jurisdiction in Federal question cases applying 4K2. This is not the case or the record in which to establish universal jurisdiction. Okay. Broad statements like that don't help us. What is the record, and why do you think that all of the things that Judge Hornby found are insufficient? This is a very fact-bound case. It would be rather foolish of us to articulate general principles about interactive websites where the Supreme Court has not dared to venture. So I'd like you to make your argument within the context that at least I tend to think of this case. Absolutely. So the district court erred in a couple of different ways. So this is a case where you're thinking about traditional notions of fair play and substantial justice, and you're looking at the inquiry. In this case, it's under the Fifth Amendment due process clause because we're under Federal Rule 4K2. And so the specific issue here is whether there was purposeful availment by this particular defendant of the forum. And we know that the forum is, in this case, the entire United States from the Swiss-American decision. And so as you evaluate those contacts, there are a couple of different principles that the district court moved away from that are critical in a case involving Internet contacts. First, it did away with the targeting requirement of purposeful availment. So it actually found that this defendant, which put up a website in Germany, accepted Euros, had a terms of service that required a forum in Germany, had not targeted. Can I? You said it did away with the targeting requirement. There's an assumption there that the law requires not just purposeful availment, but specific targeting. What is the basis for that assumption? Certainly, Your Honor. So for one example, I look at the Ticketmaster case out of this court. And in that case, there's an explanation of what purposeful availment means. And it talks about two different prongs. There's a foreseeability prong, and then there's also a voluntariness prong. And that voluntariness prong is what I'm focused on here. There must be some activity on the part of the defendant that indicates... Aren't those two different points? I'm sorry. I don't follow your question. Well, let's see. Since I was much younger and smarter when I wrote Ticketmaster. But as I recall it, the voluntariness requirement that was spelled out in Ticketmaster did not in any way require specific voluntariness. But it certainly never made specific targeting a requirement. Do you agree with that? I agree that in that particular sentence, it did not say targeting is a requirement. You're correct about that. Nor did it say that anywhere else in that opinion. I don't recall that it did. And what I believe it did say is that the jurisdiction cannot be based on the unilateral activity of others. Which is another point that we argue that the district court erred on. Because the district court writes that it isn't helpful to say whether customers in the United States reached out or whether the German company reached in. Counsel, there's something just a little bit fanciful about the suggestion that your client wasn't... Let me put it this way. The United States is one of the largest economies in the world. Surely your client hoped for business in the United States, got business in the United States, all of which is documented and is quantified here. So there was nothing surprising about the fact that they ended up doing a fair amount of business in the United States. Are you suggesting somehow that that was through the unilateral actions of others in some way that surprised your client so that it would be unfair for them to be accountable for any legal action that might result from their presence in the United States? That just seems a wholly fanciful position about your argument. Well, that is what I'm suggesting, Your Honor. And if I may, I'd like to explain why. It goes back in part to the two concepts of purposeful availment from Ticketmaster, foreseeability and voluntariness. So certainly you might say, as I think Your Honor has articulated, it would be difficult to say that it was unforeseeable that where you have United States customers, that there might be a form that was in the United States. But I think in terms of the voluntariness, what you really have here is a situation. You have a German defendant. The German defendant creates a German website. It puts that up on the web. You've got people in the United States that find it, that use that service. And there's no suggestion in this case that it has any rights to German trademarks, but simply because you've got American customers using this service, and there's no realistic way for the German website to block the United States customers from using the service. It's not like it's sending handbags or it's sending merchandise into the United States. Now, this German defendant has to cross an ocean to defend itself in Maine. But don't they have to actually approve the customer relationship when people interact with the website? Your client has to take a further step and actually approve the relationship with the customer. Isn't that true? Yes, I would use a different word than approve, but that's right. The client has to accept the business. And so, yes, it can do that, but that's no different than another defendant that simply accepts the incoming contact, the unilateral activity of members of the forum reaching in to where the customer is and then responds to it. If the client simply ignores those inquiries, then yes, I think it's a much clearer case. But under that unilateral activity rule, even if it knows that by accepting that business there is, I guess, some connection with the forum, it is still the case that this particular German defendant has not done anything to volunteer for the jurisdiction. It operates a business that is only there... You seem to think that this is a one-shot-in-time snapshot as opposed to a three-and-a-half-year pattern of activity in which your client obviously knows it's getting customers from the U.S. It's revealed in Discovery, 156 of them, roughly $200,000 worth of business. Are you really saying as a matter of law it's just a one-time shot at the time the website is set up? No, that's not what we're saying at all. All right, so then take account of these other factors. And what is the argument? So the argument is that if you apply rigorously the existing principles of due process here, the contacts, and you've articulated exactly what they are, we don't dispute that, are insufficient to create purposeful availment. So what the district court did... So wait a minute. You say they're insufficient to create purposeful availment, but you've conceded, or at least I think you've conceded, that the foreseeability prong, that there's sufficient evidence of foreseeability here. I think it was foreseeable to someone in your client's position after three-and-a-half years of a steady stream of business coming from American companies and business being transacted that it seems to me you have a very tough argument on foreseeability. I thought your argument was focused on voluntariness. Yes, that's correct. Okay. And so on voluntariness it comes down to the fact that by repeatedly accepting over this three-and-a-half year period, several hundred times accepting a business from companies in the United States to interacting with those companies, accepting their accounts, whether that constitutes sufficient activity to meet the voluntariness requirement, and if it does, whether there's something that would raise due process concerns about such a holding. Aren't those the two questions this comes down to? On purposeful availment, I think you've articulated it correctly. Now, I think if you do hold to that unilateral activity requirement, there is no jurisdiction here. The second point, because this is a close case, is that you have the gestalt factors. And so there is this idea that there's an unfairness. And so we talked a little about Ticketmaster, and that was another close case. And that was a case in which we went to the, I'm sorry, the court went to the gestalt factors. And so the concern that we raise here is if virtual contacts of this sort, where there's no shipping, there's no advertising, there's none of those sort of traditional data points that you might look at, is going to be sufficient to satisfy purposeful availment. We don't concede it is, but if it is, you still have a safety valve. You've got those gestalt factors. Because fundamentally here, what we're talking about is an inquiry of fairness, due process basic fairness. And so those gestalt factors exist very much for the closest of cases, in particular for cases where you've got an international defendant. And just briefly on that point, because I want to make sure I get this out, I'm sorry. In assessing the gestalt factors, is there play in those factors for considering the nature of the underlying lawsuit here? We have a trademark infringement case. Is there one of those factors that should take into account the nature of the litigation? Well, I guess what I would say is, in a trademark lawsuit, in general, you're talking about intangible harms. You've got a sliding scale within those factors that says the strength of the showing is going to affect how you apply those factors. So the way I would argue it is to say, you've got an intangible harm that's taking place virtually, and maybe on a purposeful availment analysis. And we do not concede this, because of unilateral activity, because of targeting. But maybe purposeful availment could be found here. But you've still got that safety valve. And I have to mention Rule 4K2, because we wouldn't be here if it wasn't for 4K2. And it's almost inconceivable that the Rules Committee, when it made that, fixed a gap in the long-arm statute. It envisioned that it would be creating a breadth of jurisdiction that you have here. It cites Asahi and Justice O'Connor's concern in that regard. Thank you. Thank you. May it please the Court. Good morning, Your Honors. Jim Goggin for the Appellee Plitzer. I'd like to ask this Court to affirm the District Court with a holding that addresses the specific facts that lead to purposeful availment here. And that is that a party that operates a highly interactive website, that is open to accept business throughout the world, and that knowingly accepts a substantial amount of recurrent business directly from consumers in a forum, has purposely availed itself of the benefits of that jurisdiction, and can reasonably expect to be subject to the burdens and responsibilities of litigation in that jurisdiction. Now, what do we do with the fact that, I guess, after the lawsuit was brought, the German company then applies for a U.S. trademark? Judge Hornby said, well, at least it goes to voluntariness. Are you going to argue anything more than that? I think it goes directly to, it shows a direct attempt on the part of the German defendant to take advantage of the benefit of the laws of this forum. It applied for a trademark application for the name scrutinizer, which is our client's trademark. The only reason, not the only, but the primary reason for applying for a trademark application is so that you can enforce your legal rights in the jurisdiction where you have a trademark registration. And we think that... You know, it strikes me as a little bit like taking remedial action after you've been notified of a potential violation that we don't normally consider. They get sued, so they want essentially to apply for a trademark and say they have superior rights over your rights, and they want to defeat the lawsuit on that ground, ultimately on the merits. Why should that count other than as example of the knowledge of doing business in the U.S.? Well, I think it counts, first of all, it does count for that. Judge Hornby's decision doesn't depend upon the trademark application. No, no. But it does, as he said, confirm it. But I think it should be considered, even though it came after the fact. We don't know. We were surprised that they filed a trademark application so that I could make this argument that they're deliberately targeting the United States in the middle of the litigation. Well, they make the argument that in some hospital case, I think, involving an injury, we said you really shouldn't look at what happens later. I think you say, look, this is an ongoing injury. This isn't a one-time event. And so that rule doesn't really apply here. That's correct. We say that. And we also say that as a matter of judicial efficiency, that the court could look at it because we could have done two things. We could have moved to amend our complaint. Judge Hornby said that could have been something we did, and he would have granted it. Even if you amended your complaint, so what? The actions occurred later. Your claim of jurisdiction is what? I understand that this jurisdictional case, but is the underlying jurisdiction federal question or diversity? Federal question. And we have said, have we not, that federal question jurisdiction is unlike diversity jurisdiction, and that even if it is not existing at the time of the original suit, but subsequent events confirm it, that that's OK. Didn't we say that in the ConnectU case? Frankly, Your Honor, I'm not aware that you did. OK. I want to talk about the burden on the gestalt factors. Judge Hornby, the only factor that he found countered against our jurisdiction was the legal action in the United States. Judge Hornby made findings with respect to the physical part of that and noted that modern times litigation is easily conducted. Most litigation doesn't happen here anyway. If we're in trial, they can get here from Germany. The other concern expressed in the Asadi case was that you were submitting a foreign national to the United States court system. However, I want to point out that that in the Asadi case and also in the Dandler case, which also commented on this, in both those cases, there was absolutely no connection to the United States other than the fact that the lawsuit was brought here. Isn't that concern about a foreign national exacerbated in this case because you have a forum selection clause in the contractual relationship that requires a suit to be brought in Germany and you have a choice of law provision in favor of German law? Don't those factors make it even more of a burden to require the German company to come here? I don't believe so. First of all, as Judge Hornby noted, those provisions don't bind my client. My client is not a customer. Those provisions only bind customers that are dealing with the German company. Don't bind us. Secondly, we believe it shows a knowledge that in fact they're going to be doing business in other countries. They expect to be doing business in other countries and they're trying to protect themselves from other countries' litigation. It's fine for them to do that with respect to their customers who voluntarily sign up with them and take the service, but it doesn't bind us. Another point I wanted to make is that on the unilateral aspect of this, if the court looks at how Judge Hornby found in his decision this works is, it's not simply a unilateral thing. What happens is the customer sees the website, decides to sign up for the service. What happens is the scrutinizer has to say, okay, we will accept your service. The customer in the U.S. uploads its software to the cloud. The German company then takes that software, does an analysis on it, then puts it back in the cloud and it goes back down where it's been modified or suggestions are made on how to improve it. It goes back down to the American company, the customer. Certainly unilateral. Certainly a purposeful availment. Certainly a deliberate action on the part of the defendant. You just said certainly unilateral. I'm sorry, I'm sorry. Certainly mutual. I'm sorry, Your Honor. Thank you for correcting me. Counsel, despite our understandable concern, we are dealing with an area of law that is not yet fully developed. It's only beginning to develop, actually. The Supreme Court hasn't spoken to it. But inescapably, even given your suggestion that we should focus on the facts of this case, the way in which this company does its business using its website strikes me as not all that unique. The way in which it uses its website is the way in which a lot of companies use their websites. And so despite our efforts to focus on the facts of this case, it's got to have large implications for many companies that conduct business exactly the way in which this company does business. I mean, it will significantly increase the likelihood that companies that do business like this company does its business will be subject to the jurisdiction of the United States. So it's not a universal jurisdiction result. But it's hard to minimize the implications of what you're asking us to do here. Isn't that true? Yes, Your Honor, that's true. Let me say two things about that. Number one, I think it's only fair if a company is out there holding itself out to the world and inviting, making itself a target, inviting business from the world and accepting business from the world that they are making money from their business. And they ought to be, as a matter of fairness, they ought to be subject if they do something wrong or they get into some dispute with one of their customers or some other party that they have a legal relationship with, such as another trademark holder. It's only fair that they be responsible for what they've done. Second part of that is they can protect themselves from this. If, for some reason, a company doesn't want to do business in, well, obviously, as the court said, the United States is a major economy. Of course, they're going to want to do business here. But if they don't want to do business in some smaller country where, you know, perhaps the rule of law is not the same as it is here or in most other civilized countries or European countries, they can geoblock. And we cited some cases that talk about that, the Spansky case. We cited some law review articles that talked about that. It's a very simple thing to block the jurisdiction where people are coming to your website. So if they don't want to do business in some small country that's at war and they don't want to do business in Libya, then they can block it and they can protect themselves in that fashion. I just, I suspect that Judge Lopez put his finger on it earlier when he said, you know, the nature of the action may prove to be pretty important in the ultimate analysis about whether or not there is specific personal jurisdiction. This is a trademark case. It's a federal question case. The U.S. has an interest in enforcing trademarks. Those interests are maybe not present in just a consumer contract. And the German company has attempted to protect itself in the consumer contract area. So although the Supreme Court hasn't yet sort of said this, we suspect in the end that will prove to be a significant factor here. I think you're correct, Your Honor, as to the protections that the foreign defendants have here. You're right. This is a specific jurisdiction case. So there's the, in addition to all the minimum contact that were shown here, the case has to be related to what it is they're doing. And they've conceded relatedness. That issue just isn't in front of us. Correct. Correct, Your Honor. As a general matter, that is another protection. And in addition, the other protection is the gestalt factor, the fairness of litigating here in the United States. Okay. Court, are there no further questions? Thank you. Got nothing further to say? To return to the comments that were just made about trademark action, respectfully, I would submit that's exactly the concern here. This is a German citizen, a German company. They have offered something. They've put it on the web as they must. Isn't it true that it would take them about three minutes, if that, to go online from Germany and look at the U.S. Trademark Office and find out whether this spiralizer name had been subject to a U.S. trademark? Yes, that's absolutely true. But the key difference is... And we have no information about whether your company did that and decided to go ahead anyway or did not do that and decided it would run the risk? That's right. The record is silent as to whether or not there was a search done of the U.S. PTO records. But there's no reason that this company operating in Germany ought to have to go and look at the trademark records of every significant economy where people might buy services. The United States, and it takes three minutes? Well, where it's a company that is... Doesn't that tend to show an intention to be here sort of regardless? No, I would disagree. I don't think that the omission of a U.S. PTO search shows an intention to be here regardless. I would suggest it shows no particular intention to target this forum. And so I think, again, you have to go back to the idea that this company has to be on the web to do its business. And the geo-blocking solution that's been suggested is subject to technology. We all log in remotely to computers to do our work sometimes. We do it and now we are virtually in a different place. Yeah, geo-blocking may be subject to technological difficulties, but there is no question that your client had it within its power to decline U.S. business. And that once it decided not to decline U.S. business, it then not only accepted the business, but processed the material that was... Not processed. Analyzed the material that was proffered to it and reported back to the U.S. customer. It did that as a result of unilateral activity of others. Well, if you define unilateral activity that way, every transaction is a result of unilateral activity. Someone initiates every transaction. But it strikes me from what I've read in these briefs that your client was a full participant in this. This isn't the case where your client did nothing but receive an order and ship out a package. Right? This is a case where there was analysis and a report. Your client was paid for that. And to stay out of the United States, all it had to do was either click on the right button or not click any button at all, not accept the proffered business. I think that the comparison to the sending the package into the United States is an apt one because the client didn't do that here. It simply conducted its business from Germany on the web. There was no action that was directed at the forum. It simply processed the customer inquiry that came in wherever it came in from. Okay. Thank you. Thank you both. Safe trip back to Maine.